IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| JONATHAN PEARSON and § <br> CATHY PEARSON, § <br>    *Plaintiffs*, § <br> § <br> v. § <br> § <br> DEPUTY VICTOR LOMELI, § <br> DEPUTY JD AGUILAR, § <br> COMAL COUNTY SHERIFF'S OFFICE, and § <br> COMAL COUNTY, TEXAS, § <br>    *Defendants*. § | Case No. 5:25-cv-00838-JKP-HJB |

**DEPUTIES VICTOR LOMELI AND JD AGUILAR'S
ORIGINAL ANSWER TO
PLAINTIFFS' FIRST AMENDED COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Defendants, Comal County **Deputy Victor Lomeli**, and former Comal County **Deputy John Dillon "JD" Aguilar** (collectively "the Deputies") file this Original Answer to Plaintiffs' First Amended Complaint (Dkt. 14), and in support thereof would respectfully Answer as follows:

### I. INTRODUCTION

1. On Thursday, January 11, 2024, Comal County Deputies responded to an address in Comal County, Texas to investigate a report of a suicide. Deputy Lomeli and Deputy Aguilar were the first Deputies that made it to the scene. Lomeli arrived first and he entered the residence. Upon entry, Lomeli saw Rebecca Wilkerson[1] sobbing over the recently deceased body of Dakota Pearson. Next to Wilkerson were her son and daughter-in-law. Immediately, it was clear that Dakota was deceased from a self-inflicted gunshot wound to the roof of his mouth. Lomeli proceeded to console the distraught Wilkerson but firmly commanded these individuals to leave the house so that law enforcement could secure the scene so that an investigation into Dakota's death could commence. These commands were obeyed.

2. Deputy Aguilar arrived second. Upon making the scene, Aguilar assisted Lomeli sweep the house for any other individuals that might have been inside without the Deputies' knowledge. Once the house was secured and confirmed to be free of any individuals who might interfere with the scene or any evidence therein, the Deputies made way for EMS to enter the house and examine the suicide. EMS confirmed what was patently obvious—that Dakota Pearson was deceased.

3. EMS was subsequently released from the scene, and Deputy Aguilar began examining evidence nearby and ensuring that it was preserved for a Detective's review later on. Once that was accomplished, Aguilar joined Lomeli outside and began to speak with the witnesses already on scene. Generally, all of the witness confirmed that Dakota had killed himself, and they further informed the Deputies that one of the sources of Dakota's depression was his relationship with his parents—Plaintiffs Jonathan Pearson and Cathy Pearson.

---

[1] Witnesses later informed Deputies that Wilkerson was renting the residence to Dakota due to his estrangement with his parents.

4.      In discussing Dakota's parents, the witnesses on scene informed them that Plaintiffs would likely be extremely aggressive with everyone when they arrived on scene. Witnesses expressed fear that they might be attacked by Plaintiffs once they arrived and warned the Deputies that they would need to keep Plaintiffs away from them in order to keep the scene safe.

5.      While Aguilar was speaking with these witnesses, Lomeli retrieved "Do Not Cross" police tape and placed it across the door to the residence. The Deputies told the witnesses that no one was allowed in or out of the residence until the investigation into Dakota Pearson's purported suicide had been investigated. Meantime, the Deputies continued speaking with witnesses and taking down their statements and information.

6.      After the Deputies had been on scene for approximately twenty minutes—Plaintiffs arrived at the scene. Immediately, Mr. Pearson and Ms. Pearson sprinted right past Deputy Lomeli who was standing next to his illuminated Patrol Vehicle. Deputy Lomeli called out, "Hey!" and Deputy Aguilar called out, "I don't need anybody running, hey slow down."

7.      Both Plaintiffs disobeyed these commands and continued sprinting towards the door to the residence, which had been blocked off with police tape. Deputy Aguilar again called out "stop you're about to go in handcuffs!" Deputy Lomeli wrapped Mr. Pearson up in a bear hug from behind in order to stop him from breaching the perimeter of the scene. Lomeli then kept ahold of Mr. Pearson and walked him away from the residence, at which time Mr. Pearson said he had had prior surgeries and injuries on his shoulder. Meantime, Ms. Pearson sprinted straight around Deputy Aguilar in contravention to commands. Aguilar grabbed her and tried to calm her and stated "ma'am!" as he attempted to interpose himself between Ms. Pearson and the taped off door. Ms. Pearson refused to stop and pushed Deputy Aguilar in the chest as she screamed "Let me in there! Those fuckers! What the fuck was going on!"

8. In order to control the scene and gain control of the non-compliant and physically resisting Ms. Pearson, Deputy Aguilar was forced to push Ms. Pearson against a nearby car so that he could gain control of her, and so that he could eventually place her in handcuffs for pushing him. As this was occurring, Deputy Aguilar calmly explained to her "I understand you're upset, but this is not helping." <u>No other force was used on the Plaintiffs</u> as the Deputies regained control of their investigation scene.

9. Meantime, Ms. Pearson began attempting to convince the Deputies to arrest the other witnesses, and the two parties began shouting accusations at each other. The Deputies then had to walk the Plaintiffs away from the other individuals on scene in order to maintain civility. The situation calmed as the Plaintiffs were walked away from the scene and the Deputies began using de-escalation techniques to soothe the understandably distraught Plaintiffs. Once farther afield from the residence, Deputy Aguilar removed the handcuffs from Ms. Pearson after she promised that she would not attempt what she had just done again.

10. Afterwards, Deputy Aguilar returned to the residence, and Deputy Lomeli remained with the Plaintiffs to talk to them. Lomeli told them that he "understood" their reaction but cautioned them that their previous behavior amounted to interfering with an accident investigation and the Deputies' public duties, and that they could go to jail if they did that again. Mr. Pearson assured Deputy Lomeli that he was now calm. Plaintiffs then began to speak with Deputy Lomeli, and they told him their perception of events that led to Dakota Pearson's suicide. At no time did either Plaintiff exclaim that they had been hurt when the Deputies stopped them from interfering with the investigation.

11. Sometime later, Ms. Pearson left the scene and Mr. Pearson remained behind with his daughter—who had subsequently arrived. Mr. Pearson sat down on the ground and was consumed

with grief. While sitting, Mr. Pearson told Comal County Deputies that he could feel a seizure coming on, and his daughter explained that he frequently had seizures due to injuries he sustained in the Iraq war. Another Comal County Deputy that had arrived on scene called for EMS to return to check up on Mr. Pearson. Subsequently, Mr. Pearson did have a seizure. Mr. Pearson's seizure caused him short term memory loss, and he was placed in the back of an ambulance to be monitored by healthcare professionals. In order to avoid Mr. Pearson flying into another rage, a decision was made to postpone re-informing Mr. Pearson of his son's suicide until EMS had evaluated him.

## II.   ORIGINAL ANSWER

### A.   Parties.

12.   Paragraphs 1 – 5: the Deputies admit that the Parties are correctly named.

### B.   Jurisdiction and Venue.

13.   Paragraphs 7 – 9: the Deputies admit that Jurisdiction and Venue are correct pursuant to 42 U.S.C. § 1983.

### C.   Facts.

14.   Paragraph 10: the Deputies admit to the factual allegations of these paragraphs to the extent they are in accord with the facts outlined *supra* in "Section I." Otherwise, denied.

15.   Paragraphs 11 – 13: the Deputies admit that they were acting under the color of law as Deputies of Comal County Sheriff's Office. Otherwise, denied.

### D.   Causes of Action.

#### i.   Count 1.

16.   Paragraphs 14 – 17: the Deputies admit that they were acting under the color of law as Deputies of Comal County Sheriff's Office. Defendants deny that they violated Plaintiff's Fourth

Amendment rights bestowed upon them by the Fourteenth Amendment. Otherwise, pursuant to Federal Rule of Civil Procedure 8(b), a defendant need not respond to plaintiff's mere legal conclusions. To the extent a response is required, Defendants deny that Defendant Comal County was in any way the moving force of any alleged constitutional violation related to the subject incident. Otherwise, denied.

    **ii. Count 2.**

17. Paragraphs 18 – 24: the Deputies admit that they were acting under the color of law as Deputies of Comal County Sheriff's Office. Defendants deny that they violated Plaintiff's Fourth Amendment rights bestowed upon them by the Fourteenth Amendment. Otherwise, pursuant to Federal Rule of Civil Procedure 8(b), a defendant need not respond to plaintiff's mere legal conclusions. To the extent a response is required, Defendants deny that Defendants Comal County and Comal County Sheriff's Office were in any way the moving force of any alleged constitutional violation related to the subject incident. Otherwise, denied.

    **E. Punitive Damages, Attorneys' Fees, Manner of Service, Jury Demand, and Prayer.**

18. Paragraphs 25 – 29 and the unnumbered Paragraph on page 7: no answer is necessary from these Defendants. To the extent any answer is deemed necessary, the Deputies admit that Plaintiffs seek the relief requested therein but deny that Plaintiffs are entitled to this relief.

### III. AFFIRMATIVE DEFENSES

19. The Deputies deny any deprivation under color of statute, ordinance, custom, or abuses of any rights, privileges, or immunities secured to the decedent by the United States Constitution, state law, or 42 U.S.C. § 1983, *et seq*.

20. The Deputies hereby invoke the doctrine of Qualified Immunity and Official Immunity. Defendants discharged their obligations and public duties in good faith and would show that their

actions were objectively reasonable in light of the law and the information possessed at that time, and that no clearly established law exists prohibiting their conduct in the factual circumstances at issue.

21. The Deputies plead that they had legal justification for each and every action taken by them relating to this incident based on the information available to them at the time.

22. The Deputies assert the limitations and protections of Chapter 41 of the Texas Civil Practice & Remedies Code, and the Due Process Clause of the United States Constitution.

23. The Deputies assert the limitations and protections of Chapter 101 of the Texas Civil Practice & Remedies Code.

24. The Deputies reserve the right to assert additional affirmative defenses throughout the development of this case.

25. To the extent the Deputies did not address a specific averment made by Plaintiffs in their Original Complaint, the Deputies expressly deny all such averments.

## IV.   JURY DEMAND

26. Pursuant to the Federal Rule of Civil Procedure 48, Defendants hereby demand a jury trial.

## V.   PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Defendants Comal County Deputies Victor Lomeli and JD Aguilar pray that upon a final hearing of this cause, the Court dismiss all of Plaintiffs' claims with prejudice, that all costs of court be assessed against Plaintiffs, and for all further relief to which they may be justly entitled.

Respectfully submitted,

**WRIGHT & GREENHILL, P.C.**
4700 Mueller Blvd., Suite 200
Austin, Texas  78723
(512) 476-4600
(512) 476-5382 – Fax

By: /s/ Stephen B. Barron
   Stephen B. Barron
   State Bar No. 24109619
   sbarron@w-g.com
   Blair J. Leake
   State Bar No. 24081630
   bleake@w-g.com

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of October, 2025, a true and correct copy of the foregoing document was caused to be served upon all counsel of record via E-File/E-Service and/or E-Mail, in accordance with the Federal Rules of Civil Procedure.

/s/ Stephen B. Barron
Stephen B. Barron